# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:10-CR-167-JEC/AJB** |
| **RAMONE GARCIA SHIRLEY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER FOR SERVICE OF
## <u>REPORT AND RECOMMENDATION</u>

Attached is the Report and Recommendation ("R&R") of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. CrR. 58.1(A)(3)(a), (b). A copy of the R&R and this order shall be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the R&R within **fourteen (14)** days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the

R&R may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review.  *United States v. Slay*, 714 F.2d 1093 (11th Cir. 1983).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED FROM the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.**  If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge.  18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986);  *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983).  The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this  8th   day of   November   , 2010.

_____

**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:10-CR-167-JEC/AJB** |
| **RAMONE GARCIA SHIRLEY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**UNITED STATES MAGISTRATE JUDGE'S**
**FINAL REPORT AND RECOMMENDATION**

Pending before the Court is Defendant Ramone Garcia Shirley's First Particularized Motion to Suppress Evidence and Statements. [Doc. 18]. The Court held an evidentiary hearing, [Doc. 21 (hereinafter "T_")], after which the parties filed briefs. [Doc. 25 (Shirley); Docs. 22, 26 (Govt.)]. For the following reasons, the undersigned **RECOMMENDS** that the motion be **DENIED IN PART AND GRANTED IN PART**.

*Facts*

On January 30, 2009, at shortly before 2:00 am, Atlanta Police Department (APD) Officer Maurico Castro, a member of the APD's DUI Task Force,[1] was sitting

---

[1] Castro has been a police officer since 1999, and a member of the DUI Task Force for six years. His training in speed law enforcement using a laser was as follows. He took the basic course at the police academy, which familiarized him with laser and

in his patrol car on the gore on I-75/I-85 northbound, just past the 17th Street Bridge in the City of Atlanta. T24, 25, 26. This location was one of several he frequents during his shift. T55. He was accompanied by Officer Young, who he was training. T25. Castro was pointing his laser speed detector at northbound traffic through the passenger window of his patrol car, which was down. T26. The posted speed limit was 55 mph, and Castro's vehicle was observable to oncoming traffic for approximately 2000 feet. T26, 34.

On that date, Castro was using a Pro Laser device, which he had been using the majority of time he was on the DUI Task Force. T28.[2] Castro explained that unlike radar, the laser device captures the speed of only one vehicle at a time. T29. Traffic was light. T34. While holding the device, he was observing traffic. He noticed a vehicle coming at him at a high rate of speed, which he estimated at approximately

radar speed detection devices. He then obtained additional training to become a certified laser speed detection operator on June 1, 2004. T10-14, 19, 54; Govt. Exh. 2. He has been continuously certified since that date. T19. He also was trained on visual observations of speeding vehicles. T20-21.

[2]     The laser device has a self-check mechanism and is calibrated at the beginning and end of each shift. T30-31. Castro checked the calibration of his laser device at the beginning and end of his shift on January 30, 2009, and the device was properly working. T33. The device also is certified annually by an independent company. T31; Govt. Exhs. 4, 5.

100 mph.  He activated his laser device, which registered the vehicle's speed at 97 mph.

T34.

Castro pulled out of the gore and followed the vehicle in order to stop it.  T35.

He got behind the vehicle, a black Mercedes CL 550, Alabama license plate 37M7K,

which had continued traveling on I-85.  T35-36.  He turned on his blue lights, but the

vehicle did not stop at first.  Castro observed the driver moving around in the vehicle.

Castro activated his siren a couple of times, and the vehicle stopped near the Buford

Highway exit.  T36.  Castro's video camera in his patrol car was not working.  T60.

Once the Mercedes stopped and Castro pulled in behind it, he called in the make,

model and tag number of the vehicle.  T62.  However, he did not receive a reply.  T62.[3]

Castro got out of his vehicle and approached the Mercedes' driver's side.  T37.

Young approached the passenger side.  T38.[4]  Castro asked the driver, who turned out

to be Defendant Shirley, why he was speeding.  Shirley replied that he was in a hurry

to get to Onyx, a strip club on Cheshire Bridge Road.  T37-38.

---

[3]     The vehicle was registered to Bernard Walker of Tuskegee, Alabama.
T72; Govt. Exh. 9.

[4]     The vehicle contained only one person.  T38.

3

Although both officers were armed, neither drew his service weapon.  T38. Castro asked Shirley for his driver's license, which he produced.  With Shirley's license in hand, Castro returned to his patrol car to continue his investigation.  When Castro returned to his vehicle to run Shirley's license, Young accompanied him.  T64. His computer check of the license through the Atlanta Crime Information Center (ACIC) revealed that the license was suspended.[5]  When Castro looked at the physical license again, he noted that it was a suspended motorcycle license.  T38-40.  The license was suspended as of December 30, 2008, due to a traffic ticket.  T40, 51; Govt. Exh. 10. The Georgia Department of Motor Vehicles would be the most accurate site for checking the status of a driver's license.  T66.  The ACIC did not provide a notification date for suspension of Shirley's licence, which is a precondition to the license being actually suspended.  T67.  (O.C.G.A. § 40-5-56).

Castro exited his vehicle and returned to the vicinity of Shirley's vehicle.  He told Young that Shirley's license was suspended, and Castro then ordered Shirley out of his vehicle and patted him down.  T41.  He could not remember if he handcuffed Shirley but, in any event, he arrested him for driving with a suspended license[6] and

---

[5]      The ACIC is plugged into the NCIC.  T65.

[6]      Shirley also was being charged with speeding and reckless driving.  T42.

4

placed him in the back of the patrol car.  He advised Shirley that his car was going to be impounded because there was no other driver present and he could not leave the vehicle on the highway.  T41.  Shirley did not give Castro any directions as to what to do with his car.  T76.

Castro then conducted an inventory search of the vehicle pursuant to the APD Impound Policy to protect the owner's valuables and insure that there were no firearms or contraband that could be stolen from the vehicle while in the impound lot.  T42, 44[7]; Govt. Exh. 6.  Castro impounded the vehicle pursuant to the APD impound policy.

---

[7]   In explaining his purpose for impounding Shirley's vehicle, Castro testified that:

> if you can't find anybody else to drive the vehicle for you or it's not left at a secure location, like, for example, the person's house, the driveway, a parking spot that's going to be safe for the vehicle, we have to impound it just for safety for his vehicle and make sure, you know, no one crashes into it or breaks into it.

T43.  He then testified that his purpose for inventorying was as follows:

> Well, after you make an arrest or you have to impound a vehicle for whatever reason, it's just to protect the owner's either valuables, make sure there's no money laying around.  You also make sure there's no illegal contraband, make sure there's no weapons that could possibly be stolen at a later date from maybe the impound lot, so basically just to protect the owner's vehicle.

T44.

5

T42; Govt. Exh. 6 (Atlanta Police Department Policy Manual) (hereinafter "the Manual"). Section 4.13.5 of the Manual provides, in relevant part, that a vehicle will be impounded upon arrest of the driver if:

    * * *

    3.    The driver is not qualified to drive the vehicle due to impairment or
          not having a valid license, and:

          a.    the operator refuses to release the vehicle to a person of his
                or her own choosing who is present and is properly qualified
                and capable of operating the vehicle, or there is no such
                person present.

          b.    The vehicle is not parked at his or her residence or property.

Govt. Exh. 6 at 30.  The Manual further provides at Section 4.13.8 (Inventory and Incident Report"), in relevant part:

    1.    An incident report and Vehicle Impound Record Form will be
          completed for each impounded vehicle.  In certain circumstances as
          contained in Section 4.13.12, the Vehicle Impound Record Form
          may be used in lieu of the of the incident report.

6

    2.    Every impounded vehicle will be inventoried prior to its release to the wrecker service.  <u>All property that has an estimated value of $10.00 or more will be removed, inventoried, and turned into the Property Control Unit.</u>

Govt. Exh. 6 at 31 (emphasis in original).

He started the inventory at the driver's side, and then moved to the console, passenger's side and glove box.  He also checked beneath the seats.  T44-45.  Under the driver's seat, Castro located an unholstered loaded Springfield X.D. nine millimeter handgun and a magazine with ammunition.  T45, 48; Govt. Exh. 8.  He also secured a diamond watch (from Shirley, which he wanted inventoried for safekeeping), a diamond bracelet, a cell phone and diamond earrings.  T48.

Castro asked dispatch to run the firearm's history and a criminal history check on Shirley, and he was advised that Shirley was a convicted felon, T49, but the firearm was not reported stolen.  T71.  As a result, in addition to the previously mentioned charges, Shirley also was charged with being a felon in possession of a firearm and carrying a concealed weapon.  T49-50.

Castro prepared an inventory report and an impound report.  T45-46; Govt. Exhs. 7, 9.

7

The vehicle was towed from the scene before Castro transported Shirley to jail. T77. The entire encounter lasted about 45 minutes. T77.

Government Exhibit 13 was a printout of Shirley's driver's license status run by ATF Special Agent Arruguetta on February 10, 2009, ten days after Shirley's arrest. T79-80. The exhibit reflects that Shirley's license was in suspension for failure to appear and lists a violation date of June 15, 2006, and a suspension date of December 30, 2008. There is no date following the space marked "SERV DT," which presumably is the date any suspension was served. Govt. Exh. 13.

### Contentions of the parties

The government concedes that any statements obtained by Castro from Shirley following Shirley's arrest were obtained without first administering *Miranda* warnings to Shirley. It therefore acknowledges that any statements so obtained are not admissible in its case-in-chief. [Doc. 22 at 2].

The government contends that probable cause supported the stop of Shirley's automobile for exceeding the 55 mph speed limit and reckless driving. [*Id.* at 11-13]. Alternatively, the government argues that reasonable suspicion that Shirley was speeding and driving recklessly supported the stop. [*Id.* at 14-16].

8

The government next argues that Castro had probable cause to arrest Shirley for speeding, reckless driving and driving on a suspended license. It argues that Georgia law, O.C.G.A. § 17-4-20(a), authorizes the arrest for traffic violation committed in the presence of the arresting officer, and since Castro observed Shirley driving 97 mph in a 55-mph zone and driving recklessly, he was authorized to arrest him. [*Id.* at 17]. It also contends that probable cause supported Shirley's arrest for driving on a suspended license because Georgia law requires only that the officer verify the suspension service date and note it on the suspension, and not verify that the motorist received notice of the suspension. [*Id.* at 18].

Finally, the government argues that the firearm was properly seized pursuant to a valid inventory search of Shirley's vehicle. [*Id.* at 20].

In response, Shirley first argues that he was in custody at the time that Castro asked him why he was speeding, and since he was not *Mirandized* his response to the question must be suppressed. [Doc. 25 at 6-7].

He next argues that Georgia law requires that a driver receive actual notice that his license has been suspended before he can be convicted of driving on a suspended license. [*Id.* at 7]. In addition, he argues that under Georgia law, a suspension of

9

driving privileges does not become effective by operation of law in the absence of notice to the driver that his license is in suspension.  [*Id.* at 7-8].

Next, Shirley argues that his arrest was unlawful because he did not have notice that his license was in suspension, and therefore, his due process rights were violated. He asks this Court to hold O.C.G.A. §§ 40-5-56 and 40-5-121 unconstitutional as void for vagueness and not giving fair warning.  [Doc. 25 at 9].  He alternatively argues that the procedure and factual basis used by Castro for arresting him, that is, mere suspicion based on hearsay rather than probable cause, violated his due process rights.  [*Id.*].

Shirley next argues that the arrest is not saved by the good faith doctrine because he mistakenly believed he was allowed to arrest someone on the sole basis of an ACIC printout without proof of service of notice of suspension on the driver.  [*Id.* at 10-11]. Finally, Shirley contends that because his arrest was illegal, the inventory of the vehicle resulting in the seizure of the firearm and ammunition also is illegal.  [*Id.* 11-12].  He also argues that the inventory search was illegal because Castro was looking for contraband, weapons and valuables, and was not conducting a valid inventory.  [*Id.* at 12-13].

10

The government replies that Shirley's response to the question why he was speeding is not subject to suppression because he was not in police custody and was not entitled to *Miranda* warnings.  [Doc. 26 at 2].

***Discussion***

*1.     The stop*

Although not apparently contested by Shirley, the Court concludes that Castro's stop of Shirley's automobile was supported by probable cause.[8]

_____

[8]     Since the Court concludes probable cause supported Castro's decision to stop Shirley vehicle, the stop also was supported by reasonable suspicion, a lesser degree of proof than probable cause.  The Fourth Amendment protects individuals from "unreasonable searches and seizures" by government officials, and its protections extend to "brief investigatory stops of persons or vehicles." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  For brief investigatory stops, the Fourth Amendment is satisfied if the police officer has a "reasonable suspicion" to believe that criminal activity "may be afoot." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  When determining whether reasonable suspicion exists, courts must consider the totality of the circumstances to determine whether the police officer had a "particularized and objective basis" for suspected legal wrongdoing. *Arvizu*, 534 U.S. at 273.  Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient. *United States v. Powell*, 222 F.3d 913, 917-8 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-5 (11th Cir. 1996).  To make a showing that in fact an officer had reasonable suspicion, he "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.' " *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (quoting *Terry*, 392 U.S. at 27).  Although reasonable suspicion "requires more than a hunch," *id.*, "the requisite level of suspicion to make an investigative stop is 'considerably less than proof of wrongdoing by a preponderance of the evidence.' " *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000) (quoting *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992), and *United*

11

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. *Whren v. United States*, 517 U.S. 806, 810 (1996). A decision to stop a vehicle is reasonable under the Fourth Amendment where an officer has probable cause to believe that a traffic violation occurred. *Id.*; *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999). Probable cause exists if, " 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense." *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002); *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). In determining whether probable cause exists, the Court "'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Illinois v. Gates*, 462 U.S. 213, 229-31 (1983) (quoting

_____

*States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)).

12

*Brinegar v. United States*, 338 U.S. 160, 175 (1949)).   "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized."  *Maryland v. Pringle*,  540 U.S. 366, 371 (2003) (internal punctuation marks and citations omitted).  However, an officer is not required to resolve all inferences and all factual conflicts in favor of the suspect.  An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for the police decision.  *Bailey v. Board of County Com'rs of Alachua County, Fla.*, 956 F.2d 1112, 1120 n.5 (11th Cir. 1992); *United States v. Pantoja-Soto*, 739 F.2d 1520 (11th Cir. 1984).

In this case, Castro had probable cause to believe that Shirley was violating Georgia law regarding maximum speed limits because he was traveling 97 mph in a 55 mph zone, based upon is visual estimation and laser speed detection device results.  O.C.G.A. § 40-6-181[9]; *see also United States v. Monzon-Gomez*, 244 Fed. Appx. 954,

---

[9]     O.C.G.A. § 40-6-181 provides as follows:

(a) The limits specified in this Code section or established as authorized in this article shall be the maximum lawful vehicle speeds, except when a special hazard exists that requires a lower speed for compliance with

959 n.3 (11th Cir. 2007) (rejecting defendant's argument that officer needed "some type

---

Code Section 40-6-180.

(b) Consistent with the provision of engineering and traffic investigations regarding maximum speed limits as provided in Code Section 40-6-182, no person shall drive a vehicle at a speed in excess of the following maximum limits:

(1) Thirty miles per hour in any urban or residential district;

(1.1) Thirty-five miles per hour on an unpaved county road unless designated otherwise by appropriate signs;

(2) Seventy miles per hour on a highway on the federal interstate system and on physically divided highways with full control of access which are outside of an urbanized area of 50,000 population or more, provided that such speed limit is designated by appropriate signs;

(3) Sixty-five miles per hour on a highway on the federal interstate system which is inside of an urbanized area of 50,000 population or more, provided that such speed limit is designated by appropriate signs;

(4) Sixty-five miles per hour on those sections of physically divided highways without full access control on the state highway system, provided that such speed limit is designated by appropriate signs; and

(5) Fifty-five miles per hour in other locations.

(c) The maximum speed limits set forth in this Code section may be altered as authorized in Code Sections 40-6-182, 40-6-183, and 40-6-188.

14

of radar device" to justify a traffic stop for speeding; for Fourth Amendment purposes, "the question is simply whether a law enforcement officer has sufficient cause to believe that a traffic law has been violated, not whether such a violation can be successfully prosecuted in court")[10]; O.C.G.A. §§ 40-14-10, 40-14-17.

Castro also had probable cause to stop Shirley for reckless driving under O.C.G.A. § 40-6-390(a).[11]   Under Georgia law, speeding, unaccompanied by other traffic violations, can form the basis for a reckless driving conviction if the state presents evidence "that a defendant was driving at an excessive rate of speed given the posted speed limit and the driving conditions existing at the time."   *Fraser v. State*, 263 Ga. App. 764, 765, 589 S.E.2d 329, 330 (2003) (footnote omitted).   Here, Shirley was driving 42 miles over the speed limit, which constituted probable cause that he was driving recklessly.   *See Fraser*, *id.* (evidence showing defendant drove 24 mph over posted speed limit in residential neighborhood constituted reckless driving).

---

[10]     Per 11th Cr. R. 36-2, unpublished decisions like *Monzon-Gomez* are not considered binding precedent but may be cited as persuasive authority.

[11]     O.C.G.A. § 40-6-390(a) provides as follows:

Any person who drives any vehicle in reckless disregard for the safety of persons or property commits the offense of reckless driving.

2.      *Asking Shirley why he was speeding*

Shirley contends that he was in custody when he was stopped by Castro for speeding and thus Castro needed to *Mirandize* him before asking him why he was speeding.

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself."  U.S. CONST. AMEND. V.  Based on this Fifth Amendment right against self-incrimination, the Supreme Court adopted a rule in *Miranda v. Arizona*, 384 U.S. 436 (1966), that "certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted in evidence."  *Dickerson v. United States*, 530 U.S. 428, 431-32 (2000) (holding that the *Miranda* decision is a constitutional decision).  "[F]ailure to give the prescribed [*Miranda*] warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."  *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (plurality opinion).

"The right to *Miranda* warnings attaches when custodial interrogation begins." *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2006).  Thus, "pre-custodial questioning does not require *Miranda* warnings."  *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006).  A defendant is in custody for *Miranda* purposes when

16

"there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Maryland v. Shatzer*, 130 S. Ct. 1213, 1224 (2010) (quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984)).  This is an objective standard from the perspective of a reasonably innocent person.  *Street*, 472 F.3d at 1309.  Stated somewhat differently, the "in-custody" standard examines whether "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave."  *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (quoting *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987)) (internal quotation marks omitted).  Courts examine such factors as whether "the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," *Street*, 472 F.3d at 1309 (quoting *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989)), "as well as the location and length of the detention," *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010).[12]

_____

[12]      Justice Breyer has stated that the following factors are helpful in evaluating whether an individual is in custody include: "how long the interrogation lasted (brief and routine or protracted?), . . .; how the suspect came to be questioned (voluntarily or against his will?) . . .; where the questioning took place (at a police station or in public?) . . .; and what the officer communicated to the individual during

17

"Traffic stops . . . are special cases that necessarily implicate a certain minimal amount of restraint on an individual's freedom of movement in order to effectuate their basic purpose." *United States v. Cole*, No. 1:09-cr-412, 2010 WL 3210963, *11 (N.D. Ga. Aug. 11, 2010) (Evans, J.) (citing *Acosta*, 363 F.3d at 1148-49); *see also United States v. Ubaldo-Viezca*, No. 09-16341, 2010 WL 3895710, *6 (11th Cir. Oct. 6, 2010) ("Ordinary traffic stops do not involve custody for purposes of *Miranda*, unless the stopped motorist is subjected to treatment during the traffic stop that amounts to a restriction of freedom to a degree associated with a formal arrest.") (citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). As a result, *Miranda* warnings are not required when an individual is detained during ordinary traffic stops, *Berkemer*, *id.*,[13] but a

_____

the interrogation (that he was a suspect? that he was under arrest? that he was free to leave at will?)." *Yarborough v. Alvarado*, 541 U.S. 652, 675-76 (2004) (Breyer, J., dissenting) (citations omitted). The Eight Circuit has identified the following six factors as "general indicia . . . in determining whether a suspect is in custody: (1) whether law enforcement informed the suspect the questioning was voluntary, and the suspect was free to leave and was not under arrest; (2) whether the suspect had unrestrained freedom of movement during the questioning; (3) whether the suspect contacted the authorities or voluntarily agreed to official requests to answer questions; (4) whether law enforcement employed strong-arm tactics or deceptive stratagems during questioning; (5) whether the atmosphere of the interrogation was police dominated; or (6) whether law enforcement placed the suspect under arrest at the end of questioning." *United States v. Plumman*, 409 F.3d 919, 924 (8th Cir. 2005).

[13]    There are "two key factors" for this rule. *Acosta*, 363 F.3d at 1149. First, a detention for a traffic stop is "presumptively temporary and brief," which "reduces

18

*Miranda* warning may be required during some stops, which involve highly intrusive, coercive atmospheres, *see Acosta*, 363 F.3d at 1148.

The undersigned concludes that the defendant's statements are not subject to suppression because the defendant was not "in custody" at the time he spoke with law enforcement.   First, that Castro had "seized" Shirley for a traffic stop does not automatically render the defendant "in custody" so as to require *Miranda* warnings before speaking to the defendant.  *See Street*, 472 F.3d at 1309-10 ("[A] seizure does not necessarily constitute custody for *Miranda* purposes.").  Also, that Shirley was not free to leave the traffic stop is also of no consequence because a driver and a passenger cannot reasonably expect to leave while an officer investigates a traffic violation.  *See Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009) (noting that traffic stop communicates to passenger that he is not free to terminate the encounter and move about at will); *Brendlin v. California*, 551 U.S. 249, 257-58 (2007) (noting that traffic stop "necessarily . . . halts the driver").

---

the danger that the driver through subterfuge will be made to incriminate himself." *Id.* (quoting *Berkemer*, 468 U.S. at 437 & 438 n.27).  Second, most motorists who are stopped will not "feel completely at the mercy of the police" because of the public nature of the stop and the circumstances are less "police dominated" than station house interrogation.  *Id.* (quoting *Berkemer*, 468 U.S. at 438, 439).

19

Second, neither Castro nor Young brandished a weapon, nor was Shirley touched or otherwise accosted at the time he was asked why he was speeding. There is no indication in the record that Castro used language or a tone that indicated that Shirley could be compelled to answer the question.

Also, although it was late at night/early in the morning, the stop occurred on the shoulder of a major interstate highway, and although the traffic was light, such a location points to a conclusion that a reasonable stopped motorist would not "feel completely at the mercy of the police" because of the public nature of the stop and the circumstances are less "police dominated" than station house interrogation. *Acosta*, 363 F.3d at 1149 (quoting *Berkemer*, 468 U.S. at 438, 439). Further, Shirley had been stopped for mere minutes when Castro asked him why he was speeding; in fact the evidence shows that Castro asked Shirley why he was speeding at the commencement of their post-stop interaction.

Finally, Castro was justified in making the inquiry. "[A]n officer's investigation of a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (quotation and citation omitted). The stop must be of limited duration and may not last "any longer than necessary to process the traffic violation unless there

20

is articulable suspicion of other illegal activity." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001).  The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop."  *Id*.  It was perfectly within Castro's authority to inquire immediately upon approaching Shirley why he was speeding, because Shirley might have had a medical or other emergency which could have explained (but not excused) his reason for speeding.

As a result, Shirley was not in custody for *Miranda* purposes and Castro's question to him about why he was speeding did not need to be preceded by those warnings.

### 3.   *Probable cause supported Shirley's arrest*

Shirley does not dispute the government's argument that probable cause supported his arrest for speeding and reckless driving.  In any event, "[a] warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Pringle*, 540 U.S. at 370 (citing *United States v. Watson*, 423 U.S. 411, 424 (1976); *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001) (stating that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth

21

Amendment, arrest the offender").  As discussed above, Castro had probable cause to stop Shirley for speeding and reckless driving.  Given this probable cause to stop, Castro could also lawfully arrest Shirley for these offenses.  *See Draper v. Reynolds*, 369 F.3d 1270, 1276 (11th Cir. 2004) (holding that same probable cause to stop vehicle for traffic violation was sufficient probable cause to arrest for the traffic violation); *United States v. Moreno*, 588 F.2d 490, 494 (5th Cir. 1979); *see also United States v. Pratt*, 355 F.3d 1119, 1123 (8th Cir. 2004) (citing cases in traffic stop context in which probable cause to stop is equated with an arrest); *United States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002) (*en banc*) ("[T]raffic stops supported by probable cause are arrests.").

This is true even if Castro testified that he arrested Shirley for driving on a suspended license because probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been.  *See, e.g., Whren*, 517 U.S. at 813-14  ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States,* 517 U.S. 690, 696 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Roy,* 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion

22

that probable cause turns on what law enforcement officers think and holding that "[c]ourts determine the existence of probable cause"). *See also Horton v. California,* 496 U.S. 128, 138 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer."). Therefore, regardless of the validity of Shirley's arrest for driving on a suspended license, he was properly arrested for speeding and reckless driving.

Nonetheless, Castro's arrest of Shirley for driving on a suspended license was lawful. First, the issue of whether there was probable cause to arrest Shirley for driving with a suspended licence is governed by federal law regardless of whether Castro complied with state law because state law regulations do not alter Fourth Amendment protections. *See, e.g., Virginia v. Moore*, 553 U.S. 164, 173-74, 176 (2008) (holding that a police officer does not violate the Fourth Amendment by making an arrest based on probable cause even if the arrest is prohibited by state law); *United States v. Mastrangelo*, 733 F.2d 793, 799 (11th Cir. 1984). "[C]omplaints that the evidence was obtained in violation of state law are of no effect." *United States v. Brazel*, 102 F.3d 1120, 1154 (11th Cir. 1997) (quoting *United States v. Butera*, 677 F.2d 1376, 1380 (11th Cir. 1982)); *see also Elkins v. United States*, 364 U.S. 206, 223-24 (1960)

23

("In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out.  The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.").

Under federal law, probable cause supported Shirley's arrest for driving on a suspended license based on the computer check run by Castro which indicated that his license was in suspension.  As noted above, the standard for probable cause is far less than that for conviction, and does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams*, 407 U.S. at 149.  The Court must "'deal with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Gates*, 462 U.S. at 229-31 (1983) (quotations omitted).  As a result, the computer check that revealed that Shirley's driver's license was suspended constituted probable cause that he was driving on a suspended license.

Even if judged by state law standards, probable cause supported Shirley's arrest on the driving on suspended license charge.  In *Johnson v. State*, 297 Ga. App. 254,

24

676 S.E.2d 884 (2009), the Georgia Court of Appeals held that probable cause supported the defendant's arrest for driving on a suspended license even though dispatch told the officer that the defendant had not been served with the required notice of suspension of his license:

> OCGA § 40-5-60 provides that "[a]ll revocations and suspensions provided for in this chapter shall be effective on the day the driver receives actual knowledge or legal notice thereof, whichever occurs first. Notice of suspension by operation of law shall be considered legal notice." As we recently reaffirmed in *State v. Fuller*, 289 Ga. App. 283, 656 S.E.2d 902 (2008), a driver cannot be convicted of violating OCGA § 40-5-121 unless he or she received notice of suspension, as required by OCGA § 40-5-60. In *Fuller*, we affirmed the reversal of the defendant's conviction in the probate court for driving with a suspended license because the State failed to prove beyond a reasonable doubt that the defendant received notice that her license had been suspended for accumulation of points pursuant to OCGA § 40-5-57. *Id.* at 285, 656 S.E.2d 902; *see also Farmer v. State*, 222 Ga. App. 591, 474 S.E.2d 760 (1996) ("In order to establish the offense of driving with a suspended license, the State must show that the accused was driving, that his license was suspended, and that the accused had received actual or legal notice of the suspension.") (citation and punctuation omitted); *Sumner v. State*, 184 Ga. App. 374, 375, 361 S.E.2d 536 (1987).

> Contrary to Johnson's argument, dispatch's report that Johnson had not been served with notice of suspension did not affirmatively establish that Johnson had no actual or legal notice of the suspension and that the license suspension therefore was not effective. Service of written notice is not the only means by which a driver may obtain actual knowledge of a suspension. For example, a driver has actual knowledge if, on a prior occasion, a police officer has verbally notified him or her of the suspension. *See Arnold v. State*, 189 Ga. App. 900, 901(2), 377 S.E.2d

25

918 (1989).  Even in the absence of actual knowledge, a driver may be convicted if he or she has legal notice of suspension.

> The term legal notice has been referred to as the same as constructive notice.  Constructive notice is information or knowledge of a fact imputed by law because the fact could have been discovered by proper diligence and the situation was such as to cast upon a person the duty to inquire into it.

(Citations and punctuation omitted.) *Hale v. State*, 188 Ga. App. 524, 525(1), 373 S.E.2d 250 (1988).  Notwithstanding the information he received from central dispatch, [the officer] had no way of knowing if Johnson had actual knowledge that his license was suspended by means other than formal service of notice or whether facts or circumstances existed that would have placed Johnson on constructive notice.  We do not believe that this uncertainty rendered [the officer] powerless to arrest Johnson.

Our prior decision in *Carter v. State*, 196 Ga. App. 226, 395 S.E.2d 891 (1990), is instructive.  Following a one-car automobile accident, a police officer interviewed the defendant, determined through a computer check that the defendant's Florida driver's license was suspended, and placed the defendant under arrest.  *Id.* at 227, 395 S.E.2d 891.  During subsequent searches of the defendant and two bags that had been in his possession, police recovered a small bag of marijuana.  *Id.*  After he was convicted of driving too fast for conditions and possession of less than one ounce of marijuana, the defendant appealed, arguing that his arrest and the subsequent searches were unlawful because, *inter alia*, he did not receive actual or legal notice of the suspension of his driver's license.  *Id.* at 226-227, 395 S.E.2d 891.  We held that, assuming arguendo the defendant was arrested solely for driving with a suspended license, the arrest was lawful:

> The legality of the warrantless arrest depended on whether or not at the time of the arrest the officer had probable cause

26

> to believe that an offense had been committed. The cause need not have risen to the level of proving guilt at trial. The factfinder's later finding of a failure of the State's evidence at trial would not retroactively vitiate the arrest if the arrest was supported by probable cause at the time. This it was, due to the results of the arresting officer's on-the-scene check of appellant's . . . license.

(Citations omitted.) *Id.* at 228, 395 S.E.2d 891. Likewise, we conclude here that Johnson's arrest was lawful, and the factfinder's ultimate conclusion that Johnson did not have notice of the suspension did not "retroactively vitiate" the probable cause supporting the arrest. "[Johnson's] alleged non-receipt of notice of license suspension, if not proved otherwise by the State, may have made conviction unsustainable, but would not have affected the legality of his arrest on the charge." (Citation omitted.) *Id.*

*Johnson*, 297 Ga. App. at 255-58, 676 S.E.2d at 886-87 (footnotes omitted).

The Court also finds it significant that in footnote 5 of the *Johnson* decision, the court wrote:

> We note that, previously, OCGA § 40-5-121 provided that "[t]he charge of driving with a suspended or disqualified license shall not be made where the suspension is a result of a failure to respond under Code Section 40-5-56 . . . unless the arresting officer has verified a service date and such date is placed on the uniform citation." OCGA § 40-5-121(b)(1) (2005). A 2006 amendment deleted this subsection, and no such requirement was in place at the time of Johnson's arrest. *See* Ga. L. 2006, p. 449, § 12.

*Id.*, 297 Ga. App. at 257 n.5, 676 S.E.2d at 887 n.5.

27

Based on this discussion, the Court rejects Shirley's arguments. First, while he cannot be convicted under state law of driving on a suspended license without proof that he received the required notice, the above authorities demonstrate that probable cause to arrest a driver for driving on a suspended license exists even if proof of notice is at that time lacking.

The Court also rejects Shirley's argument that O.C.G.A. §§ 40-5-56 and 40-5-121 are unconstitutionally vague and do not provide fair notice. The version of § 40-5-56(a) in effect at the time of Shirley's arrest provided in material part that

> the department shall suspend the driver's license or privilege to operate a motor vehicle in this state of any person who has failed to respond to a citation to appear before a court of competent jurisdiction in this state or in any other state for a traffic violation other than a parking violation.

At the same time, O.C.G.A. § 40-5-121(a) provided in material part that

> any person who drives a motor vehicle on any public highway of this state without being licensed as required by subsection (a) of Code Section 40-5-20 or at a time when his or her privilege so to drive is suspended, disqualified, or revoked shall be guilty of a misdemeanor for a first conviction thereof.

"The due-process clause of the fifth amendment requires that a statute be declared void if it is so vague that 'men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *United States v. Mena*, 863 F.2d 1522,

28

1527 (11th Cir. 1989).  When a case does not involve a First Amendment issue, a constitutional challenge to a statute on void for vagueness grounds must be "as applied" to "the facts of the case at hand."  *United States v. Fisher*, 289 F.3d 1329, 1333 (11th Cir. 2002).  Under the void-for-vagueness doctrine, a criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  As a result, the void for vagueness doctrine has actual notice and arbitrary enforcement components.  *Id.*  Although the more important aspect of the doctrine is whether the legislature established minimal guidelines to govern law enforcement, courts must still examine whether the statute provides actual notice.  *United States v. Biro*, 143 F.3d 1421, 1426 (11th Cir. 1998).  "In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged."  *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963).  This is done by deciding "whether an ordinary person could 'reasonably understand that his contemplated conduct is proscribed.' "  *Biro*, 143 F.3d at 1426 (quoting *Nat'l Dairy Prods.*, 372 U.S. at 32-33).  The Supreme Court has explained the notice or fair warning requirement as follows:

29

There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.  Second, as a sort of junior version of the vagueness doctrine, the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered.  Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.  In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.

*United States v. Lanier*, 520 U.S. 259, 266-67 (1997) (internal quotation marks and citations omitted).  If the statute has a scienter requirement, this generally mitigates a law's vagueness, "especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).  The burden is on the defendant to prove that the statutes are unconstitutionally vague.  *United States v. Cherry*, 938 F.2d 748, 754 (7th Cir. 1991).

Viewed under these standards, neither statute is unconstitutionally vague, nor do they fail to give fair warning.  First, § 40-5-56 is not a penal statute at all, but prescribes what the Department of Public Safety shall do to a licensed driver's license if that

30

person has failed to respond to a citation to appear before a court of competent jurisdiction in this state or in any other state for a traffic violation other than a parking violation.  A person of ordinary intelligence would understand what the law requires.

Likewise, § 40-5-121 is constitutional.  It prohibits a person whose driver's license has been suspended from driving on the streets of this State.  Shirley is confusing the notice statutorily required under the statute, the absence of which prevents a conviction for driving on a suspended license, with the fair notice required to make a statue pass constitutional muster.  A law which criminalizes the operation of a motor vehicle following suspension of that person's license is constitutionally clear and definite, especially when coupled with the requirement that the state prove that the operator received the required notice before he could be convicted.  Shirley has pointed to no case which holds that the government or state's inability to ultimately convict a defendant of violating a statute by failing to prove the statutory elements of that statute renders unconstitutional the arrest of the offender for violating that statute when the arrest is supported by probable cause.

Therefore the undersigned rejects Shirley's arguments and concludes that he was properly arrested for driving on a suspended license in violation of O.C.G.A. § 40-5-121.

31

*5.     Inventory search*

Since Shirley was lawfully arrested, the Court rejects Shirley's argument that the subsequent impound of his vehicle and inventory of its contents were the fruit of his illegal arrest.

Shirley also makes an independent argument that the inventory was unlawful, but this argument also fails for the reasons that follow.  After lawfully taking custody of a vehicle, law enforcement officers may conduct an inventory search of the vehicle in order to protect the owner's property while it is in police custody, to protect the police from claims of lost or stolen property, and to protect the police from potential danger. *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987).  An inventory search must be conducted according to standardized criteria.  *See Florida v. Wells*, 495 U.S. 1, 4 (1990).  "[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Id.*; *see also Bertine*, 479 U.S. at 372 (approving an inventory search where there had been "no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation"). *Cf. Whren*, 517 U.S. at 811-12 (finding that pretext will not invalidate an investigatory stop so long as there was probable cause, but acknowledging that, in the context of an inventory search, an officer's improper motive invalidates objectively justifiable

32

behavior); *see also United States v. Khoury*, 901 F.2d 948, 959 (11th Cir.) (finding that officer's search had no purpose other than investigation and stating, "such a warrantless investigatory search may not be conducted under the guise of an inventory"), *modified on other grounds*, 910 F.2d 713 (11th Cir. 1990); *United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir. 1982) (observing that inventory searches are "limited to effectuation of the recognized purposes for which they are conducted and they may not be used as a pretext for intrusive investigatory searches that would otherwise be impermissible") (quotation marks omitted).

At the same time, "the mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search." *United States v. Crawford*, 294 Fed. Appx. 466, 472 (11th Cir. 2008) (quoting *Bosby*, 675 F.2d at 1179); *United States v. Ponce*, 8 F.3d 989, 995 (5th Cir. 1993) ("Since Ponce has failed to show that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation, the search was reasonable under the Fourth Amendment.") (citing *Bertine*, 497 U.S. at 372-74); *United States v. Staller*, 616 F.2d 1284, 1290 (5th Cir. 1980) (approving inventory search where even assuming that the officers suspected that the vehicle contained additional contraband when they conducted the search, "[a]n officer's suspicion that evidence may be present does not invalidate an

33

otherwise lawful inventory search" and noting that "if an inventory search is otherwise reasonable, its validity is not vitiated by a police officer's suspicion that contraband or other evidence may be found") (citations omitted).

The Supreme Court and lower federal courts have strictly adhered to the requirement that, for a search to be justified as an inventory, there must be a standard inventory policy, and the officer's conduct must not exceed that which is allowed under the policy. *See Wells*, 495 U.S. at 4-5 (finding a lack of "standardized criteria" or "established routine" fatal to a purported inventory search in which the police forced open a locked suitcase found in an impounded vehicle); *Khoury*, 901 F.2d at 947-60 (finding that a subsequent inspection of a notebook found after an initial inventory of a vehicle, exceeded the scope of what was allowed under an inventory search); *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991) ("The Supreme Court has indicated that inventory searches are only justifiable if performed pursuant to explicit and comprehensive procedures. Without such procedures, officers are left with no guidance in the performance of a duty which is meant not as an investigatory technique but as a means for safeguarding individuals' possessions and protecting police from false claims."). In this case, it is undisputed that the APD has a comprehensive

34

inventory policy and that Castro's search did not exceed the scope of what was required or allowed under that policy.

Essentially what Shirley is arguing is that Castro had a "mixed motive" in inventorying his vehicle, i.e., that in addition to following the APD inventory policy, he was searching for incriminating evidence. The Court has been directed to no case where evidence was suppressed as a result of an inventory search in which the officer both followed standardized procedures and harbored the intent to search for incriminating evidence. In fact, a number of courts have ruled that the presence of such dual motivation does not invalidate an otherwise valid inventory search. *United States v. Judge*, 864 F.2d 1144, 1147 n.5 (5th Cir. 1989) ("It would be disingenuous of us to pretend that when the agents opened Judge's bag, they weren't hoping to find some more evidence to use against him. But, they could have also reasonably had an administrative motive, which is all that is required under *Bertine*. While there are undoubtedly mixed motives in the vast majority of inventory searches, the constitution does not require and our human limitations do not allow us to peer into a police officer's 'heart of hearts.' "); *United States v. Cecala*, 203 F.3d 836 (Table), 2000 WL 18948, *2 (10th Cir. Jan. 12, 2000) ("While mixed motives or suspicions undoubtedly

35

exist in many inventory searches, such motives or suspicions alone will not invalidate an otherwise proper inventory search.").

Thus, although Castro's statement that he was searching for contraband, firearms and valuables may demonstrate that he had an improper purpose in conducting the inventory search, there is no dispute that Castro followed the approved procedure and completed the necessary forms. Any such mixed motive is insufficient to invalidate the inventory search. As a result, the firearm and ammunition were lawfully seized.

### *Conclusion*

Defendant Shirley's motion to suppress evidence and statements is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED** to the extent that the government concedes that any statements made by Shirley after his formal arrest are not admissible as evidence in the government's case-in-chief. It is **DENIED** as to (1) Castro's stop of the automobile that Shirley was operating, (2) Shirley's response to Castro's question at the beginning of the traffic stop, "Why were you speeding?", (3) Shirley's arrest, and (4) Castro's subsequent inventory search of the vehicle.

The Court has now ruled on all pretrial motions and has not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

AO 72A
(Rev.8/82)

**IT IS SO RECOMMENDED AND CERTIFIED**, this the ‾8th‾ day of
‾November‾, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

37